## CHARLES E. BABCOCK AND OTHERS *vs.* WILLIAM D. HUBBARD, EXECUTOR.

Hartford Dist., March T., 1888. PARK, C J., CARPENTER, PARDEE, LOOMIS and BEARDSLEY, Js.

*H,* an attorney who had rendered important legal services to sundry parties in recovering valuable real estate in which they had fractional interests, at their request and for their convenience took a mortgage in his own name as trustee from a purchaser of the property. This mortgage he ultimately foreclosed and the title held by him became absolute. Most of the parties were persons of small means and it was agreed by them that he should be paid for his services and disbursements from the property when sold. *H* afterwards became the absolute owner of the property through the purchase, by a person procured by him, of a prior mortgage on which a decree of foreclosure had been obtained, the title being conveyed to him by the purchaser some time after it became absolute. This purchase was made with his own funds, after his clients had failed to raise money for the purpose. The intermediate purchaser bought the mortgage at a discount of two hundred dollars, which *H* allowed him to 'retain for his services. He notified his clients of the purchase of the mortgage and that they could take it if they chose, which they failed to do. The property remained unsold until the death of *H,* which occurred a few years later, and was finally sold by his executor. In a suit against the executor for an account of the proceeds of the sale, it was held—

1. That *H,* in taking the title, took a mere naked trust, and that none of the ordinary duties of a trustee in the care of trust property arose.
2. That, in the absence of any evidence that such was the intention of the parties, the relation of *H* to his clients as their counsel was not to be regarded as interrupted by the trust.
3. That the rule, therefore, that a trustee cannot charge the estate for professional services had no application to the case.
4. That the agreement that *H* should be paid from the proceeds of the property when sold, created a lien on such proceeds for his professional charges.

5. That professional services rendered by *H* and charged in the name of and due to a law firm of which he was a member, were embraced by the lien, and could be brought into the account against the property by *H's* executor.

6. That the lien covered the charges, both of *H* and of the firm, that were made for services rendered before the trust as well as after.

7. That the request of his clients that he should take his pay out of the proceeds of the sale of the property was equivalent to a request for delay in payment and a sufficient ground for charging interest on the items of the account.

8. That the estate of *H* was not bound to account for the discount obtained by the intermediate purchaser of the prior mortgage upon the property.

[Argued March 7th—decided June 26th, 1888.]

ACTION for an account of the proceeds of trust property sold by the defendant as executor, and for damages for the negligent administration of a trust by the testator; brought to the Superior Court in Hartford County, and heard before *Phelps, J.* Facts found and judgment rendered for the defendant, and appeal by the plaintiffs. The case is fully stated in the opinion.

*F. Chamberlin* and *E. S. White*, for the appellants.

1. The items $631.14 and $470.20 for the bill of Waldo, Hubbard & Hyde and interest thereon, were not proper charges against the fund in the defendant's hands and should have been disallowed.—1st. Because the whole bill of $631.14 was for matters *prior* to the creation of the trust, and not for any expense incurred in its execution.—2d. Because the defendant has not paid the same, or any part thereof, and is not in any way liable therefor. Although it is found that the accounts between the survivors of the firm and the estate of Mr. Hubbard have not been settled, it does not appear that the firm is indebted to his estate, and if it were, the defendant would not be liable to it for these claims or any part thereof.—3d. Because there was no agreement that Waldo, Hubbard & Hyde, or Mr. Hubbard, should have any lien on the notes in his hands, as trustee, for their services and disbursements prior to the creation of the trust, and from the facts the law would not imply one, for "under no

circumstances can a trustee set up a claim to trust property adverse to that of the *cestuis que trust.*" Perry on Trusts, § 433. Mr. Hubbard's clients undoubtedly expected to pay his firm for these matters out of the proceeds of their notes when collected or sold, and while it would be very natural for them to have had among themselves such expectation and understanding as the court has found, it seems very improbable that in 1873, when these notes were accepted and all parties expected to obtain ready money from their sale, one word should have passed between them and Mr. Hubbard about the payment of his bill. The fact, too, that the amounts charged were not fixed until October, 1880, raises a very strong presumption that the matter of the amount and payment of this account was not then mentioned between Mr. Hubbard and his clients, while the fact that there never was any agreement that for such charges either he or his firm should have any lien on the property in his hands as trustee, seems conclusive that he and his clients never understood that he was to pay his firm's charges for their prior services out of any moneys coming to his hands as trustee. The payment over in October, 1874, to the *cestuis que trust* and their assignee of the entire $5,000, then collected by Hubbard and his firm, is additional proof that no one regarded these prior matters as a charge upon the trust estate.—4th. Because, being in favor of the firm of Waldo, Hubbard & Hyde, their allowance here could not be pleaded in bar of a suit hereafter brought thereon by that firm, for they are not parties to this case and therefore not bound by its decisions. Only the item of $250 of the $631.14 was against *all* of the parties who were *cestuis que trust*, the remander being for services rendered the Babcocks and Starrs and not the Marcys and Kilbourns. Suppose the plaintiffs were to suffer these items to be allowed the defendant in this case, and he should never pay the same or account to the survivors of the firm therefor. Would the firm, or its survivors, be in any way barred from hereafter maintaining a suit upon this very claim? Or assume, for argument's sake, that all the claims of the defendant were to be allowed and a balance of $464.23 were

still due. By what marshaling of accounts or methods of computation could it be determined what portion of this claim for matters arising prior to the commencement of the trust had been satisfied, and what not?

2. No interest was collectible on bills of Waldo, Hubbard & Hyde until after demand made or bill rendered; and *a fortiori* not until after the amount of the several charges had been determined. *Day* v. *Lockwood*, 24 Conn., 186; *Crosby* v. *Mason*, 32 id., 482, 487; *Clark* v. *Clark*, 46 id., 586, 590. "The rule adopted in this state is, that *primâ facie* a mere account on book does not draw interest." *Crosby* v. *Mason*, *supra*. "That an account is unliquidated is often a decisive objection to the allowance of interest." *Clark* v. *Clark*, *supra*. "Mutual accounts, in the absence of custom, do not draw interest unless a bill is rendered or demand made." *Id.* Where, as in this state, interest is not recoverable as interest, but as damages for the detention of the money after it becomes due, it would seem clear that no interest can be recovered upon an ordinary account for services rendered, until after a demand of some kind has been made and the debtor in some way advised of the amount of his alleged indebtedness. Especially should such be the rule of law as to these charges, where, prior to October 4th, 1880, the debtors could have had no idea of what was or would be charged, and the creditors even, save as to a very small part, were apparently ignorant. There is a wide difference between allowing interest on a claim for services rendered upon a known or agreed basis of compensation, and those rendered upon an altogether unknown and undiscoverable system of charging, and while interest in the one case might sometimes properly be allowed, in the other its allowance before account rendered, or demand made, or amount known, is opposed to the first principles of equity. As to the matters charged in these bills for professional services the amounts were not fixed prior to October 4th, 1880, nor was any demand made or bill rendered until then, and the allowance of interest on the same prior to that date was clearly erroneous.

3. A trustee is not entitled to charge his *cestuis que trust*

for professional services of himself or his partners. Perry on Trusts, § 432; 2 Swift. Dig., 131; *Sykes* v. *Hastings*, 11 Vesey, 363; *Morgan* v. *Hannas*, 49 N. York, 667; *S. C.*, 13 Abb. Pr. R., N. S., 361; *Hough* v. *Harvey*, 71 Ill., 72; *Kendall* v. *N. Eng. Carpet Co.*, 13 Conn., 383. Trustees can only be allowed costs out of pocket for professional services transacted by a firm, one of whom is a trustee, though the business be done by one of the partners who is not a trustee. *Christophers* v. *White*, 10 Beav., 523; *Lyon* v. *Baker*, 5 DeGex & Sm., 622; *Mahoney* v. *Mackubin*, 54 Maryl., 268. A trustee must not be in a position where his interest is opposed to his duty, and cannot receive pay for services where his relation is such that his personal interest may conflict with the duties of his trust. *Frazer* v. *Palmer*, 4 Young & Coll., 517; *Broughton* v. *Broughton*, 5 DeGex, M. & G., 164; *Sutton* v. *Jones*, 15 Vesey, 584. In respect to these matters, Mr. Hubbard's personal interest was to have the professional charges as large as possible, while his duty as trustee required him to have the necessary service done *as* reasonably as possible, and a conflict of duty with individual interest was inevitable. This wholesome doctrine is akin to that equally wise though rigid principle of both law and equity, which avoids all contracts made by a trustee with himself. *Davoue* v. *Fanning*, 2 Johns. Ch., 251; *Munson* v. *Syracuse, etc., R. R. Co.*, 103 N. York, 58, 72. By the courts of South Carolina a trustee is refused compensation for professional services rendered by himself for himself, on the ground that no man can make a contract with himself. *Mayer* v. *Galluchat*, 6 Rich. Eq., 1; *Jenkins* v. *Fickling*, 4 Dess., 369; *Edmonds* v. *Crenshaw*, Harper's Eq., 232. The allowance of such charges conflicts, too, with that other principle of equity jurisprudence which forbids a trustee from making money out of the trust estate, and although it may seem a hardship to deny eminent and respectable attorneys fees to which they may seem justly entitled, merely because they are themselves trustees, it should be remembered, as has been judicially said "that they are required to sustain such losses in order that attorneys may be respectable."

2d. The allowance of greater sums than the necessary services of other competent attorneys would have cost was clearly erroneous. In *Perkins's Appeal*, 108 Penn. St., 314, where the court, contrary to the general rule, held that a trustee was entitled to pay for his professional services, it was expressly limited to " such reasonable compensation as he would have paid had he been obliged to employ counsel." The legal work called for by these cases did not require the services of expensive counsel or warrant a compensation of $75 per day. The suits were mostly ordinary foreclosures in which no defense was claimed or answers filed. In these there were no hearings in court except short ones and such as are usually necessary to fix time for redemption and pass decrees. In only one case was there a trial of any issue of law or fact, and in that a trial was clearly unnecessary, for there was no defense, as it was an application to open a decree passed in a case of which the plaintiff had failed to receive the notice sent him, of which Mr. Hubbard had been advised by the post-office authorities in. Washington. If there be any ground on which such charges can properly be allowed, then upon the same principle can a trustee, whose time is usually worth $100 per day, charge his *cestuis que trust* at that rate for work which he might have hired done for a hundredth part of that sum. For Mr. Hubbard's personal services as trustee the additional sum of $1,525 was allowed, making, with the bill of his firm, something more than $4,900 for personal and professional charges.

4. As against the Marcy and Kilbourn interest in the trust estate, no interest on moneys advanced by Mr. Hubbard should have been allowed. 1st. When advised by him that money must be advanced to save their interest in the property, they offered through Stedman, their attorney, to forward a check at once if he would advise them of the " exact amount wanted." 2d. By the letter of May 30th, 1877, Mr. Hubbard promised to advise Stedman as soon as he could get matters into proper shape for contribution of the amount wanted, but he never did. 3d. He never afterwards advised Stedman of the amount which Mrs. Marcy

and Mr. Kilbourn would have to contribute to redeem, or of the amount which he wanted them to contribute, or asked them or either of them, or Mr. Stedman as their attorney, to furnish any funds for any purpose. 4th. As to them, such advances were wholly voluntary and not made on any express or implied request, and to allow a trustee interest on moneys advanced, under such circumstances, is to say that a trustee may force his *cestui que trust* to become a borrower of his money and secure the same by a lien on the trust estate.

5. The court should have held that the estate of Mr. Hubbard was liable for the value of the trust property as of March, 1882, or as of some time in 1883. In 1881, and again in 1882, Babcock wrote him urging him to sell the property and close the trust. He objected to a sale because Starr would not consent. All the other parties had consented, and Starr refused on the ground that he had no interest. Babcock then urged Mr. Hubbard to sell and hold the Starr part of the proceeds, or else apply to a court and get proper authority to sell. Starr's persistent refusal rendered a sale with his consent impossible, and Mr. Hubbard ought at that time to have sold the property and closed the trust under the direction of a court, if necessary. His offers to sell if Starr would consent, and refusals to sell or convey except on such consent, were all conditioned upon that which was so clearly impossible as to avail nothing. His proposals to bring proceedings in court to have the property sold were seconded by the Babcocks, in getting and furnishing to him information as to Starr's granddaughter, (which Starr had refused to give,) and were likewise urged in their letters, but no court proceedings were begun, and for lack of the necessary action on the part of the trustee the trust estate was suffered to be gradually eaten up by accumulations of interest, taxes and trustee's charges. Mr. Hubbard in 1883, to all appearances, had determined to take the consequences of applying the whole property to the payment of his claim, and by his statements to his son on several occasions during that year " that the property was absolutely and

unqualifiedly his own, and that no one else had any interest in it," by his exclusive possession and control of the property, and by his failure for a year to communicate a single word to the parties interested, he certainly did all that anyone could do to appropriate the property to his own use, and his estate should therefore have been held to be accountable for its value as of that time.

6. The defendant should have been held liable for the value of the property as of August, 1884. Upon his father's death he took possession of the premises, and thereafter used and occupied them as belonging to him exclusively as executor, always refused to admit that his father held the land in trust at the time of his death, and subsequently sold it without the knowledge or consent of the plaintiffs or of any of them. When notified by the plaintiffs " that they claimed to have an interest in the property, and that he held it in trust for them, the defendant denied that they had any right or interest, and assured them that no one except the estate of R. D. Hubbard had any right or interest therein." And in August, 1884, in answer to the more positive written claim of the plaintiffs, he wrote them deliberately and under the advice of his counsel, " that the property was absolutely and unqualifiedly his, and that no one else than his father's estate had the slightest legal claim to it." And on August 22d, 1884, in a letter in which he offered to sell the property for $20,000, he represented that it had cost his father's estate more than that sum without including a good many items of expense, when in fact the actual cost at that time, inclusive of every item claimed, could not have exceeded $18,000. A more unqualified assumption of exclusive ownership and possession, or positive repudiation of all rights of the *cestuis que trust*, could not be made, and the results of such wrongful appropriation and conversion of the trust property to his own exclusive use the defendant should have been made to bear by being held accountable for the value of the property as of that time.

7. The account should have been reduced to the extent of $200 and interest thereon, on account of the discount at

which the Marcy mortgage was purchased, and by such further sum as would represent the difference between seven per cent. interest and the legal rate on the various amounts therein included. In the purchase of the mortgage W. D. Hubbard was acting for his father, on whose agreement to save him from loss he relied, and R. D. Hubbard was acting for his *cestuis que trust*. He informed Starr at that time "that he thought it was better that he, personally, should not hold it, and he would have it in his son's name," and wrote Babcock "that his son got it at $200 discount, which would be his profit when the mortgage was paid, but that he could have it if he wanted it, and that if he could find some one to take it off his hands his son would be much obliged." Had Babcock taken the mortgage upon the offer of that letter, would the $200 profit have been exacted of him by Mr. Hubbard? Evidently Babcock and Starr must have understood, and Mr. Hubbard intended to have them understand, that the mortgage was precisely the same as if in his own hands. They could not have understood that the $200 profit to accrue to the purchaser, when the mortgage should be paid, was expected to accrue from any other payment than such as might be made in redemption of it by some of the persons, other than themselves, who were entitled to redeem. The legal rate of interest in December, 1876, and until April 20th, 1877, was seven per cent., and when Mr. Hubbard assured his son that he would get the $200 and seven per cent. for his trouble, he manifestly assumed that the mortgage would be redeemed, and that until redemption the rate of interest would remain unchanged. In making the purchase W. D. Hubbard did not rely on the assurance of $200 profit, or of seven per cent. interest, but on his father's promise to save him from loss, which on a mortgage security worth from two to four times the debt could not from 1877 to 1879 have exceeded the interest at legal rates. In May, 1879, W. D. Hubbard had no legal claim against his father for the $200 which he never had paid, nor for any greater interest on the moneys advanced by him than the legal rates. Such sums as his father then paid him in excess of the

amount lawfully due him should, as between the defendant and the plaintiffs, have been disallowed, and said items of $10,161.13 and $3,822.05 reduced accordingly. When Mr. Hubbard paid his son, in May, 1879, he gave a memorandum check for $10,163.13, and on this he paid only five per cent. interest for several months, and for a long time prior thereto seven per cent. was in excess of the market as well as the legal rate.

*A. P. Hyde* and *C. E. Gross*, for the appellee.

PARDEE, J. In February, 1872, Charles E. Babcock and his wife Lydia, plaintiffs, and Eben T. Starr and his wife Almira, whose interest is now in Ewen McIntyre, plaintiff, claiming that one George H. Penfield had procured from them by fraudulent representations a conveyance of their interest in certain valuable real estate in Hartford, which upon the finding constituted their entire property, employed Richard D. Hubbard, of the firm of Waldo, Hubbard & Hyde, as an attorney-at-law to institute and conduct such legal proceedings as should be necessary for the recovery of their estate. In that month he in their behalf brought a bill in equity to set aside the conveyance. Immediately thereafter negotiations for an adjustment of the controversy commenced, and the son of George H. Penfield made proposals for the purchase of the interests of all owners of the land, including the complainants in that bill. Thereupon E. E. Marcy and his wife, owners of a part thereof, plaintiffs, retained Mr. Hubbard as an attorney-at-law to protect their interests.

The title of all these persons to the land was by devise from Dolly Babcock. Claims exceeding $20,000 in amount having been presented against her estate, it had been represented insolvent. Of these the devisees disputed many. At their request Mr. Hubbard spent much time and labor in resisting those which they deemed unjust and in bringing the estate into a condition for division. As the outcome of these labors it was agreed between creditors, heirs and devisees, that the estate should be represented by the sum of

$50,000; that the debts should stand at $13.602.41; the balance to be divided among the heirs and devisees according to their respective rights.

These last agreed to sell, and Charles H. Penfield agreed to buy, their interests in the land, and secure payment by a mortgage thereof with other property. Mr. Hubbard advised the grantors to require from the grantee a separate note for, the share of each, all to be secured by one mortgage to a trustee to hold the title for the equal and common benefit of all, that there might be no opportunity for priority as between them. The grantors requested him and he consented to take and hold the title as trustee for such purpose. On or about April 29th, 1873, C. H. Penfield, having received a deed from the heirs and devisees, executed and delivered to him as such trustee the several notes required, and secured the payment thereof by his mortgage deed to him, as trustee, his successors and assigns, of an undivided three fourths interest therein. The terms and conditions of this trust were not expressed in the deed; neither was any written declaration of the trust ever made or asked for. But he held the notes in trust for the persons whose interests in the land they represented. With the exception of E. E. Marcy and wife, the persons for whom Mr. Hubbard was counsel were unable to pay him otherwise than from the proceeds of the notes. They were anxious to convert their interest in the land into money, and accepted the notes because of their belief that they would readily sell in the market; and it was their understanding that he would be paid from the proceeds of such sale. The notes were not sold; they matured in April, 1874, but remained unpaid. In May following Mr. Hubbard commenced proceedings for foreclosure . in September following, by consent of his clients, he granted an extension of one year to the mortgagor upon payment of $5,000. This sum he paid to his clients *pro rata.*

In June, 1875, he renewed proceedings for foreclosure, and obtained a decree in October following . the time of redemption to expire in February, 1876. The mortgagor not redeeming, the title then became absolute in Mr. Hub-

bard as such trustee. Thereafter, with the consent of his clients, he agreed to sell the interest thus acquired by him to the mortgagor upon present payment of $2,000, the balance in instalments. Mr. Hubbard paid the $2,000 to E. E. Marcy in reduction of a prior mortgage upon the property in his favor. Charles B. Penfield made no further payments.

In September, 1876, E. E. Marcy commenced proceedings of foreclosure against C. B. Penfield, and Mr. Hubbard, trustee, as owners of an undivided three fourths thereof, and against W. J. Babcock and Catherine S., his wife, and Alfred E. Ely, a mortgagee, as owners of the remaining fourth. By decree of court the debt was fixed at $6,554, and the third Monday in May, 1877, was made the limit for redemption. Mr. Hubbard as trustee had no funds for redemption; the Babcocks, plaintiffs, had none; the Starrs, whose interest is now represented by the plaintiff McIntyre, had none. In January, 1877, at the request of Mr. Hubbard, his son, the defendant, bought the Marcy mortgage at a discount of two hundred dollars and took an assignment thereof. Mr. Hubbard at once gave notice of this purchase to C. E. Babcock, and offered the mortgage interest to him. He also asked Mrs. Marcy to repay her proportion of this sum, and made to her a partial statement, omitting interest and other items. Mrs. Marcy asked for a complete statement, promising to pay upon presentation thereof. Mr. Hubbard said he would advise her as soon as he could "get matters into proper shape for contribution." He did not make the complete statement.

There being no redemption of the Marcy mortgage the title vested in W. D. Hubbard, subject to a prior mortgage to the State of Connecticut, which he subsequently paid from his own funds.

On or about the 17th of September, 1878, Catherine S. Babcock, as the owner in fee of one fourth interest in the real estate, and Wells J. Babcock as tenant therein by the curtesy, and Alfred E. Ely as a mortgagee thereof, brought their petition to the Superior Court in Hartford County,

showing that they had never been served with notice of the
foreclosure proceedings instituted by E. E. Marcy, and ask-
ing for leave to redeem.  During the pendency of this pe-
tition, on May 17th, 1879, W. D. Hubbard conveyed to
R. D. Hubbard the premises included in the Marcy mortgage,
and on the same day R. D. Hubbard gave him a memorandum
check for $10,163.13, on which check he paid on August
25th, 1879, $7,000, and the balance on September 22d, 1879,
with interest at the rate of five per cent. from the date of
the check.

R. D. Hubbard thereupon intervened in the suit com-
menced by Catherine S. Babcock and others, before men-
tioned, and filed a cross-bill therein, and such proceedings
were subsequently had that the court passed a decree allow-
ing the petitioners to redeem the mortgage originally held
by Marcy, but also decreed that if they did not pay to R.
D. Hubbard the sum of $3,706.14, with interest from the
29th day of May, 1879, on or before the 27th day of July,
1879, they and each of them should be barred of all interest
in the premises.

Neither Catherine S. Babcock, Wells J. Babcock, nor Al-
fred E. Ely, have ever paid that sum, and they have become
barred of all rights in the premises, and the legal title
thereto became vested in R. D. Hubbard individually.

It is found that it was the understanding between the
plaintiffs and Mr. Hubbard that the latter should be paid
for services and disbursements from the proceeds of the
property.  No one offered to pay him or asked for a state-
ment of his account before Charles E. Babcock's request for
it in September, 1880.  His letter contained these para-
graphs : " I merely want the amount due against the estate,
including your bill.  It will be necessary for me to have the
items.  I feel confident of making arrangements that will be
satisfactory to all."  Mr. Hubbard gave it with this expla-
nation : " The interest items in the account are left blank,
also the items for my personal services in raising money for
redemption of the Marcy mortgage, payment of the state
mortgage, taxes, etc., and for managing the property.

These can be adjusted hereafter upon settlement of the account." C. E. Babcock made no objection to the charges. He did not pay them.

In 1875 Mr. Hubbard instituted proceedings for foreclosure in order to obtain possession of the whole premises; also an action of ejectment against C. H. Penfield in the name of E. E. Marcy, upon his mortgage; and had judgment upon the latter at the expiration of the time limited for the redemption of the former.

At a time prior to October, 1881, the plaintiffs, with Mr. Hubbard's consent, placed the property in the hands of a real estate agent for sale. They received and rejected an offer of $20,000. In that month McIntyre offered to pay Mr. Hubbard $15,000 in full for his fees and disbursements, and demanded a warrantee deed. Mr. Hubbard refused to execute such a deed for the reason that there was or might be some outstanding interest in Starr, or in his grandchild, but offered to execute a quitclaim deed. This McIntyre refused to accept, and offered payment and security against any possible claim upon the part of Starr or of his grandchild. Mr. Hubbard then declined to make conveyance, claiming that there was some uncertainty or embarrassment arising from the interest of some other party. McIntyre abandoned all further efforts to accomplish a settlement. In 1881, 2 and 3, C. E. Babcock urged Mr. Hubbard to sell and close the trust. In 1882 Starr refused to give consent to a sale, giving as his reason that he had no interest. Babcock urged Mr. Hubbard to sell and hold the Starr portion of the proceeds, or apply to the court and obtain authority to sell. At this time Mr. Hubbard refused to sell although all others than Starr had consented. He declined to sell in the absence of consent from all; but repeatedly offered to release the property to any one of them upon consent of the others, and allow them to sell subject to his claim. He refused to sell and convey without such assent, because he could not obtain consent either from Starr or his grandchild.

At the time of the sale of the property the disbursements

made by Mr. Hubbard and the charges for his legal services, together with a proper compensation for his services as trustee, amounted, with legal interest, to more than the price received by the defendant for the property.

During the year prior to his death, Mr. Hubbard stated to his son, W. D. Hubbard, on several occasions, that the property was absolutely and unqualifiedly his own and that no one else had any interest in it.

After March, 1883, he had no correspondence with any of the parties in relation to the property, nor did he see any of them in respect to it.

Prior to 1883 Mr. Hubbard at all times considered that he held the property as trustee, and often so stated in his letters to the plaintiffs or some of them, and he intended to manage the same in good faith and for the best interests of the plaintiffs, and did so manage the same unless the facts hereinbefore stated constitute negligence.

After his death the plaintiffs verbally notified his executor that they claimed to have an interest in the property, and that Mr. Hubbard had held it in trust for them. The executor denied that they had any right or interest in the same, and assured them that no one except the estate of R. D. Hubbard had any right or interest therein.

Afterward, on August 16th and August 22d, 1884, the executor, in an answer to letters received from C. E. Babcock, sent to him the following letters:

"HARTFORD, CONN., August 16, 1884.

"C. E. BABCOCK, ESQ.: DEAR SIR,—Your favor of the 14th inst. received and noted. Mr. Gross, who has been looking up the title for me to the property in question, finds, he told me yesterday, that the property is absolutely and unqualifiedly ours, and has so been passed on by the courts. This is as my father told me sometime before his death, but you were so positive it was otherwise that I had Mr. Gross go carefully through the whole matter to verify my remembrance. If you heirs could come up here at once with the *cash* and pay principal and interest due the estate, I am not

sure but we should all be glad to deed you the property. Mr. Gross assures me there is no one who has the slightest legal claim to the property except the estate of R. D. Hubbard.　　　　Yours truly, W. D. HUBBARD, *Executor*.

"HARTFORD, CONN., August 22, 1884.

"C. E. BABCOCK, ESQ.: DEAR SIR,—Yours of the 19th received and noted. I find the property in question stands us in at least $20,000, without adding any extras and figuring only simple interest. I will be pleased to sell it to you, or any one else, for that price; offer good for thirty days from above date. If you wish it, would let one half the purchase money remain on mortgage on the property at six per cent. If you *cannot* or do not *care* to raise that amount of money, let us drop the subject, for it has taken more of my time looking over the accounts to get exactly how the thing stands than I care to spend again if you do not mean business.

" May 17, '79, there was due R. D. H., $10,506.35
Interest at 6 per cent. to Nov. 17,
　　1884—5 years, 6 months, 　.　　　3,466.00
Taxes paid since 1879, 　　.　　.　　　816.71—$14,789.06
Due Waldo, Hubbard & Hyde, Sept.
　　1, 1880, 　.　.　　.　　.　　.$2,175.20
Interest at 6 per cent. from Sept. 1,
　　1880, to Nov. 17, 1884, 　.　　.　　555.87— $2,731.07
Due R. D. Hubbard for services as trustee since
　　1873—11 years at $250, 　.　　.　　.　　.　　2,750.00
　　　　　　　　　　　　　　　　　　　　　　　─────────
　　　　　　　　　　　　　　　　　　　　　　　$20,270.13

"As I before remarked, I have not put in a good many items, and when I found what I did put in amounted to much more than the property would bring, I did not figure closely at all. Yours truly, W. D. HUBBARD, *Executor*."

The executor upon his father's death took possession of the land, and thereafter used and occupied it as belonging to him exclusively as executor, always refused to admit that R. D. Hubbard held it in trust at the time of his death, and,

without the knowledge of the plaintiffs or of any of them, on the first day of July, 1885, sold a part of it to Trinity College, and received therefor $6,250, and on August 14th, 1885, sold the balance of the land to Trinity College and received therefor the sum of $11,750, which sums were the then value of the land.

Afterwards the executor, in November, 1885, furnished an account to the plaintiffs' attorneys at their request.

Upon the foregoing facts the plaintiffs claimed—

1. That in this action no part of the bill stated to be due to Waldo, Hubbard & Hyde, amounting to $631.14, could properly be allowed the defendant, and that the same and $470.20 charged as interest should be disallowed.

2. That if said $631.14 were allowed, no interest should be allowed on the same until after October, 1880, when the bill was rendered ; and the item $470.20 for such interest should be reduced to that extent.

3. That a trustee cannot charge his trust estate for professional services of himself or of his partners, and that all the charges for legal services in the bill of Waldo, Hubbard & Hyde against R. D. Hubbard trustee, should be disallowed.

4. That for the legal services rendered by Mr. Hubbard and his firm, as claimed by the bill of the firm against him as trustee, only such sum, if any, should be allowed as Mr. Hubbard would have been obliged to pay had he employed, upon as reasonable terms as he could, some competent attorney outside his own firm to perform the professional services necessary in the suit.

5. That as against the Marcy and Kilbourn interests, no interest should be allowed on any moneys advanced or paid by Mr. Hubbard, as trustee or otherwise.

6. That no interest should be allowed on any of the bills or charges of Waldo, Hubbard & Hyde for disbursements and professional services until after October, 1880, when the bill for the same was rendered, and that the item $399.15 for such interest should be reduced accordingly.

7. That Mr. Hubbard was guilty of such negligence in

the execution of the trust and in neglecting, when request-
ed so to do, to dispose of the property and close the trust,
that his estate was liable to account to the plaintiffs for its
value, (1st) as of March, 1882, when he neglected to sell,
and, (2d) as of some time in 1883, when, as appeared by
his statements on several occasions to his son, he had de-
termined to appropriate and had appropriated the trust prop-
erty to his own use.

8. That the defendant was liable for the value of the prop-
erty as of August 16th, 1884, when, upon careful examina-
tion of the matter and under advice of counsel, he asserted
his sole ownership as executor and denied all rights of the
plaintiffs.

9. That of the item of $10,611.13 claimed to have been
paid W. D. Hubbard, $200 and interest on the same should
be disallowed on account of the discount at which the Marcy
mortgage was bought, and that this item should be further
reduced so as to make the interest on the various sums there-
in included at the legal rate instead of at the rate of seven
per cent., at which it has been figured.

But the court overruled all of the claims of the plaintiffs
and rendered judgment for the defendant.

Upon the foregoing facts the court found and decided
that R. D. Hubbard and W. D. Hubbard always held the
property in trust, and allowed all the charges in the defend-
ant's account as stated except the item of $150 for services
of the defendant, and also ruled that the defendant should
be charged with interest on $6,250, from July 1st, 1885, to
August 17th, 1885, and on $11,750 from August 14th, 1885,
to August 17th, 1885.

The plaintiffs appealed for the reason, substantially, that
the court overruled the foregoing claims.

Upon the facts, from the commencement to the close of
the transactions mentioned in the record, the relation of
Mr. Hubbard to such of the plaintiffs as were parties to the
original suit instituted in 1872, was that of counsel to client
in proceedings at law. They believed themselves to have
been deprived of all property belonging to them by the

fraudulent act of another, and that the wrong could only be redressed by the judgment of a court. To aid them in obtaining this they retained him as counsel, undoubtedly because of their knowledge of his ability and honesty. They stood in need of, and intended to secure, the services of an advocate to regain in court their lost property; they were not looking for a keeper of it when restored. For upon restoration it was their expectation to convert it forthwith into money, pay their counsel, and possess the balance in their own right.

But they were unexpectedly hindered in their effort to convert real estate into money, and were forced to accept the notes of the purchaser. There were several of these, each representing the interest of one of many owners; all to be secured by one mortgage. For the purpose of preventing any one of these payees from obtaining or claiming any priority as between themselves, Mr. Hubbard suggested that the mortgage should be made to an indifferent person as trustee for the equal benefit of all. For this purpose he permitted them to deposit the title in his name, upon a naked trust to maintain equality and convey upon request.

It is not found as a fact, and there is no presumption of law upon the finding, that the creation of this trusteeship in form was intended by the plaintiffs, or understood by Mr. Hubbard, as an interruption of the relation of counsel and client, if there should be further occasion for professional services for the protection of the property; only an incident to it; a temporary device in aid of it. The plaintiffs were all of legal capacity. The deposit of their title was a voluntary act. The understanding between them and him, as disclosed by the attending acts and facts, as to the character and extent of this trusteeship, is the law of its being. The words "trust" and "trustee" are not, of legal necessity, of unvarying meaning and measure. The plaintiffs could by agreement, express or implied, put such limitation upon or give such meaning to them as it should please them to do. Doubtless when they deposited the title they hoped that the mortgagor would pay the notes at the end of the year, and

that there would be no further need of Mr. Hubbard's services. But it was not certain that the notes would be paid; it was certain that there was a mortgage underlying their own, with accumulating interest. They knew that to be possible which came to pass, namely, that some one would be compelled to go into court as counsel to defend the property from the prior mortgage and to enforce their own. With knowledge and in approving silence they accepted his continued services as counsel in court in saving them from the loss of the property; and this without any attempt to substitute another. And although the legal effect of his permission to make him the grantee as trustee in the deed is that of a written agreement by him to hold the title for the sole benefit of the plaintiffs, yet when the question to be determined is whether he shall be allowed compensation for services as counsel in legal proceedings previously commenced and subsequently continued for the protection of the estate, the understanding between himself and them as to that matter may be proven by parol. The denial of compensation is a rule in equity for the protection of those not in a condition to protect themselves. But inasmuch as these plaintiffs were of legal capacity, and could resume the title at will; as they had knowledge that the fund stood in need of a defender in court; that in the absence of any effort on their part to provide another Mr. Hubbard acted in that capacity without objection from them, there is neither need nor place for the rule. If, being again in possession of their title, they believed themselves able to defend it thereafter without his aid, and if, as they now assert, their property was fourfold the value of his equitable lien thereon, justice to him, and to themselves as well, required them to terminate the existing relation of counsel and clients, to decline thereafter to accept his professional services if offered, procure other counsel to protect the property, and use the title as security in the market for money wherewith to discharge their equitable obligations to him. They did neither of these things. They continued to accept service and detain money from him.

We find no occasion for denying, or for considering even,

the proposition that a trustee cannot receive payment from the *cestui que trust* for professional services in defense of the fund. In view of the limitations placed upon this trusteeship by the plaintiffs when created by them, such rule has no application.

And as Mr. Hubbard held the title at their request and for their convenience upon the naked trust to convey at their command, he was under no additional obligation either to find a purchaser at a price satisfactory to them, or to take the initiative in inducing them to join in permitting him to sell, or to take the responsibility of selling upon the request of a part only, or to assume any risk by warranting the title. No other obligation was upon him than to release to them the title, having himself placed no cloud upon it. He could perform his duty by conveying upon their request. Inasmuch as they voluntarily deposited the title with him, so from the beginning it remained their right, and within their power, to resume it and dispose of the property at their pleasure. If at any time they had any reason for believing that it could be sold for a price acceptable to themselves, it was within their power, and was their duty, to unite and make the sale and request conveyance by him. It is found that in furtherance of that right he repeatedly offered to convey to such purchaser as they might find, subject to his equitable lien. But upon the record they neither found such purchaser nor united in asking a release from him to themselves. If therefore any loss had resulted from an omission to sell, it would have fallen upon those who had power and right to sell, coupled with the obligation to protect their own interests by so doing. They cannot now unite and make his estate responsible for an omission to sell at the times named in the reasons for appeal.

Moreover, on some day prior to October, 1881, the plaintiffs could have sold the property for $20,000. There is no finding that on any previous day they could have obtained more; therefore no loss is proven to have resulted from holding it until that time. There is no finding that on any subsequent day Mr. Hubbard had their consent to sell it for

less; no finding that on any subsequent day he could have sold it for a greater sum than was obtained for it by the defendant; no finding that he could have sold it for a sum greater than the amount of his equitable lien. Therefore no loss to the plaintiffs is proven.

Mrs. Marcy had notice that he had been compelled to protect her interest in the estate by the advancement of money. She had a partial statement as to the amount. If she desired to stop the accumulation of interest on that portion of which she had knowledge, the obligation was upon her to repay it. The fact that she would remain indebted for the unknown portion is no legal justification for withholding payment of the known portion.

In December, 1871, C. E. Babcock and wife, and Eben T. Starr and wife, (the interest of the latter being now represented by E. McIntyre), retained Mr. Hubbard, and the firm of which he was a member, to institute the original suit for the recovery of the property. It is found that at some stage of the proceedings the parties came to an understanding with him that his fees and disbursements should be paid from the proceeds of the notes when collected. This understanding whenever made covered the entire duration of service. Therefore in addition to such lien as he might have had by law, there was one by agreement which covered his professional charges. The acceptance of the title by him for the purposes specified did not as a matter of legal necessity affect these liens. It did not break the continuity of service or disbursement; did not distinguish those which preceded from those which followed such acceptance. The accounting is to proceed precisely as it would have done if the title had been deposited with some person other than Mr. Hubbard.

The court has found that he, and his executor since his death, received from the property $20,085.77; and expended in services and money thereupon $20,340, in round numbers. An item in this last amount is charged by Mr. Hubbard in the name of his firm, Waldo, Hubbard & Hyde, against the persons for whom he held the property, for services prior to the date of the deed. Under the agreement he, if living, as

a member of that firm might have presented that account in its name and for its use, and the allowance thereof upon such presentation would have barred the firm from a second presentation against any individual interested in the property. In this proceeding the plaintiffs are entitled to nothing from the defendant executor which they could not have demanded and received from the testator upon a similar statement of the account. From the latter they could not have demanded either a reconveyance of the property, or payment for its value, or damages, until payment for the services of the firm through him as well as for the disbursements by him individually.

So far forth as the allowance of interest is concerned, it is found, as has been said, that the plaintiffs, with the exception of E. E. Marcy and wife, were poor and unable to pay Mr. Hubbard for his services and disbursements, and were compelled to ask him to look to the proceeds of the property when recovered and converted into money; that he acceded to this, and that such thereafter was the understanding between them. The institution of a trust of the character of the one before us did not of legal necessity affect that understanding. There is no finding that the parties terminated it; none that the plaintiffs ever offered to pay him. Therefore he was relieved by them from any obligation to demand payment as a prerequisite to interest. The debtor's request for delay is the legal equivalent of presentment, and interest rightfully accrued while they asked indulgence. Moreover, Mr. Hubbard stated in writing to C. E. Babcock, in October, 1880, that the interest items in an account then stated were left blank for adjustment upon settlement; to which no objection was then made.

On December 23d, 1876, W. D. Hubbard, the defendant, at his father's request, purchased the Marcy mortgage upon the land in question, paying therefor $6,600.06; in July, 1887, he paid for taxes $1,167.12; on the prior mortgage to the state $822; for advertisements $17.25; and on September 10th, 1884, a tax of $176.80. On May 17th, 1879, R. D. Hubbard repaid him these sums, with interest at the rate

of seven per cent., and this payment of interest is made a charge by the defendant in stating the disbursements of R. D. Hubbard for the property. It is objected that this rate of interest is in excess of the legal rate. The statute reducing the rate from seven to six per cent. was approved on March 23d, 1877, and went into effect on the first day of June of that year. It is true, therefore, that during the largest portion of the time the legal rate was six per cent.

But inasmuch as it is the finding of the court in express terms that Mr. Hubbard's charges against the property with legal interest exceed the receipts therefrom, we must understand that, after reducing the rate from seven to six per cent., there yet remains a balance in his favor. Therefore the allowance of the excess over six per cent. worked no injury to the plaintiffs.

Inasmuch as the relation of Mr. Hubbard to the plaintiffs was continuously that of counsel to client, in the absence of a limiting agreement they are under obligation to pay such fees for his services as he usually received; such as are commensurate with the legal learning and ability which they knew him to possess, and which upon their request he used for the protection of their rights. The finding is that he was obliged to give a great amount of time to the examination of the claims against the estate of Dolly Babcock, and that there were numerous and lengthy consultations between him and his clients in effecting the negotiations with George H. Penfield. It is also found that "the various charges for services in these suits are mostly for services rendered by R. D. Hubbard; the accounts charged by him are fair and reasonable, and no larger than he charged and received in other cases, but are larger than necessary services by other competent attorneys would have cost." This finding must close discussion upon that point.

Assuming the purchase of the Marcy mortgage at a discount of $200 to have been made by Mr. Hubbard himself, the plaintiffs would not now have any cause of complaint if he, living, should retain the amount of the discount. He was under no obligation to protect the property by advanc-

ing money for a prior mortgage; he was a stranger to it, and, so far forth as it was concerned, to them. He met all moral and therefore all legal and professional obligations to them in that matter, when he informed them of what had been done, and that, if they would repay the money advanced, the advantages resulting from the purchase should be to them. During several years they omitted to avail themselves of his offer. It is now too late to enforce it against his executor.

There is no error in the judgment complained of.

In this opinion the other judges concurred.